UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    -v-<br><br>GEORGE GRAHAM,<br><br>                        Defendant. | No. 17 Cr. 663 (RA) (SLC)<br><br>**OPINION & ORDER** |

**SARAH L. CAVE**, United States Magistrate Judge.

## I. INTRODUCTION

Before the Court is the motion of the United States of America (the "Government") for an order directing the Clerk of the Court to apply $200,000 (the "Security") currently held in the Court's registry to secure Defendant George Graham's appearance bond (the "Bond") to the outstanding amount of restitution that Mr. Graham owes pursuant to the judgment dated May 1, 2019 (Dkt. No. 36 (the "Judgment")). (Dkt. No. 65 (the "Motion")).[1] Mr. Graham opposed the Motion, and on October 9, 2025, the Court held a hearing on the Motion. (Dkt. Nos. 79 (the "Opposition"); 90; 93; 94; 95; 101 (the "First Hearing")). In an Opinion and Order dated October 29, 2025, the Court held the Motion in abeyance pending further submissions and another hearing, which took place on December 17, 2025 (the "Second Hearing"). United States v. Graham, No. 17 Cir. 663 (RA) (SLC), 2025 WL 3022327 (S.D.N.Y. Oct. 29, 2025) ("Graham I").

For the reasons set forth below, the Motion is DENIED without prejudice. In addition, Mr. Graham's related request for appointment of counsel (Dkt. Nos. 116–17) is DENIED.

---

[1] The Honorable Ronnie Abrams referred the Motion, which is non-dispositive, to the undersigned. (Dkt. No. 87).

## II. BACKGROUND

### A. Mr. Graham's Criminal Proceedings

For a description of Mr. Graham's criminal proceedings, we incorporate by reference the summary in Graham I.  See 2025 WL 3022327, at *1–3.

### B. The Motion

For a description of the correspondence and filings relating to the Motion, we incorporate by reference the summary in Graham I.  See 2025 WL 3022327, at *3–5.

#### 1. The First Hearing

On October 9, 2025, the Court held the First Hearing, at which Mr. Schulman[2] appeared on Mr. Graham's behalf and Mr. Graham, who currently resides in Ghana, appeared telephonically.  (Dkt. Nos. 90; 93; 94; 95; 101 at 3:8–15).  Despite outreach from Mr. Graham's counsel, neither Amanada, Gladys Graham, Ms. Bent, nor any other contributor of funds to the Security appeared at the First Hearing.  (See Dkt. No. 101 at 10:18–25, 14:9–11).  Aside from Mr. Graham, no one asserting ownership over the Security appeared at the Hearing.  When the Court asked the Government whether it had "information that Mr. Graham had funds of $200,000 that he could [have] personally posted at the time his bail package was entered[,]" the Government responded that it was "not aware of any information that would support that notion."  (Id. at 9:20–25).  Mr. Schulman also argued that "the evidence [did] bear out that it was not Mr. Graham's monies."  (Id. at 16:10–11).

---

[2] We continue to use names and terms as defined in Graham I.

2

## 2. **Motions to withdraw**

In response to Mr. Graham's request for appointment of counsel to assist him in responding to the Motion, on July 22, 2025, Judge Abrams had ordered that a Criminal Justice Act ("CJA") attorney be appointed, and Camille Abate, Esq. was so appointed. (Dkt. No. 75). On September 6, 2025, Ms. Abate requested to be relieved from the appointment, citing numerous communications with Mr. Graham indicating "irremediable damage to the attorney/client relationship." (Dkt. No. 84). Mr. Graham did not respond to Ms. Abate's request, and on September 22, 2025, the Court granted her request. (Dkt. No. 88). The next day, Mr. Schulman, replacement CJA counsel, entered an appearance on Mr. Graham's behalf. (Dkt. No. 89).

On October 31, 2025, Mr. Schulman moved to withdraw as court-appointed counsel for Mr. Graham. (Dkt. No. 104 (the "MTW")). As grounds for withdrawal, Mr. Schulman asserts that the attorney-client relationship with Mr. Graham "has broken down irretrievably[,]" and that "recent developments have created serious ethical and safety concerns that make continued representation [of Mr. Graham] untenable." (Id. at 1). Mr. Schulman explained, inter alia, that "Mr. Graham has repeatedly refused to follow legal advice, issued hostile communications, and copied prosecutors on emails despite explicit instructions not to do so." (Declaration of Counsel dated Oct. 31, 2025 (the "Declaration")). Among the hostile communications that Mr. Graham sent to Mr. Schulman included messages, which the Court has reviewed, containing derogatory comments about Mr. Schulman's race and religion. (Id. at 2).

The Court directed Mr. Schulman to file proof of service of the MTW on Mr. Graham and granted Mr. Graham the opportunity to respond to the MTW by November 24, 2025. (Dkt. No. 105). On November 4, 2025, Mr. Schulman served the MTW on Mr. Graham using the email

3

address with which Mr. Graham had been corresponding, and Mr. Graham confirmed receipt of the MTW.  (Dkt. No. 106 ¶¶ 1–2)).  The same day he received the MTW, Mr. Graham sent a separate email from the same email address, stating "I George Graham was copied in the MTW by Eylan Schulman.  Please withdraw him from my case.  I believe that he is trying his best to have me lose my case.  And I don't want him to represent me.  Thank you[.]"  (Id. ¶ 3).

Before the deadline for Mr. Graham's response to the MTW, an individual using the email address legendsofthegame213@gmail.com began sending emails to Judge Abrams, the undersigned, the Government, and Mr. Schulman (the "Legends Emails").  Like the messages that Mr. Schulman described and attached to the Declaration, the Legends Emails used threatening and inappropriate language toward the Court and Mr. Schulman, but did not respond to the substance of the MTW.  Due to their inflammatory nature, the Court placed the Legends Emails under seal.  (Dkt. No. 109).  While the sender of the Legends Emails is unclear, as noted in Graham I, Judge Abrams had previously warned Mr. Graham to cease contacting the Court using "offensive and harassing language[.]"  2025 WL 3022327, at *5 n.5.

On November 23, 2025, Mr. Schulman filed, on Mr. Graham's behalf, a response to the MTW.  (Dkt. No. 108 (the "MTW Response")).  In the MTW Response, Mr. Graham declared, under penalty of perjury pursuant to 28 U.S.C. § 1746, complaints about his prior assigned counsel, Mr. Henry and Ms. Abate, and that he is not the owner of the Security but did not directly address the MTW or request that a new attorney be appointed.  (See id.)  On November 24, 2025, we issued orders deeming Mr. Graham not to oppose Mr. Schulman's withdrawal, granting the MTW, and deeming Mr. Graham to be proceeding pro se going forward.  (Dkt. Nos. 111; 113).

4

### 3. The Second Hearing

On December 17, 2025, the Court held the Second Hearing, in which Mr. Graham participated by telephone and spoke on his own behalf. (Dkt. Nos. 114; 115; 118; Dkt. entry dated Dec. 17, 2025). The Court noted that, notwithstanding its invitation to any person or entity claiming ownership of the Security to file a motion to exonerate (or return) the Security pursuant to Federal Rule of Criminal Procedure 46(g), "no such motion was filed[.]" (Dkt. No. 118 at 3–4). The Government also represented that it had not been contacted by anyone "indicating that they were trying to file or intended to file such a motion pursuant to the Court's order[.]" (Id. at 4). The Court also noted that no one appeared at the Second Hearing "seeking to be heard with respect to the [] [M]otion." (Id. at 4).

The Court renewed its question to the Government whether it had "any other information about the source of the $200,000 in cash[.]" (Dkt. No. 118 at 5). The Government responded that it had "no additional information" and referred to the statements in its "earlier submissions pointing toward ownership by [Mr. Graham]." (Id. at 5). At the Court's invitation, Mr. Graham stated:

> I would like to say for the record that the $200,000 in question is not [m]y money, never was my money. I've never in my life owned $200,000. I've never owned a TD Bank account. And you could reference Docket Number 108 and Docket Number 110, which is my sworn affidavit giving testimony on everything in this case, including – once again saying, it's not my money, never was my money. It belongs to others, friends and family.

(Id. at 7). In response to the Court's question why the "other people [] who had put up that cash or a portion of that cash" had not come forward, Mr. Graham asserted that he had "never asked for that" and reiterated his belief that the Government had not proved it was his money. (Id. at 8; see id. at 10).

The Court concluded the hearing and indicated that a decision as to the Motion would issue in due course. (Dkt. No. 118 at 10).

### 4. Post-hearing events

On December 19, 2025, two days after the Second Hearing, Mr. Graham submitted two letters asserting that he "was forced to defend [him]self without counsel" and that he "did not waive [his] right to an attorney[,]" which the Court construes as a renewed request for appointment of counsel. (Dkt. Nos. 116–17 (the "Request")).

On January 2, 2026, Mr. Graham filed a letter reiterating his request that the Court deny the Motion and stating:

1. The bail funds are not mine. The $200,000 was posted entirely by third parties (family, friends, and a church). I have never owned, possessed, controlled, or had access to these funds.
2. No relief is requested by me. I am not asking that any funds be returned or released. I am only asking that the Court recognize the funds as third-party property and deny the government's motion.
3. The record already establishes third-party ownership. The Court has before it a fully executed third-party bond agreement and sworn affidavits from myself, the surety/property owners [sic] confirming that the funds do not belong to me.

(Dkt. No. 121; see Dkt. No. 122).[3]

---

[3] Although Mr. Graham has represented to the Court that he lives in Ghana (Dkt. No. 94), he addressed these letters from a location in Bronx, New York. (Dkt. Nos. 121 at 1; 122 at 1).

6

### III. DISCUSSION

#### A. Legal Standard

Under 18 U.S.C. § 3663, a sentencing court is authorized to impose a restitution order on a criminal defendant. 18 U.S.C. § 3663(a)(1)(A). As is relevant here, the Mandatory Victim Restitution Act of 1995, 18 U.S.C. § 3611 (the "MVRA") provides that "an order of restitution . . . is a lien in favor of the United States on all property and rights to property of the person fined as if the liability of the person fined were a liability for a tax assessed under the Internal Revenue Code[.] The lien arises on the entry of judgment and continues for 20 years or until the liability is satisfied, remitted, set aside, or is terminated[.]" 18 U.S.C. § 3613(c). See United States v. Brumer, 405 F. App'x 554, 555 (2d Cir. 2011) (summary order). The lien provision of the MVRA represents Congress's judgment that "the Government ha[s] a legitimate interest in ensuring that [a] valid restitution order imposed as part of [a defendant's] sentence [is] satisfied." Lavin v. United States, 299 F.3d 123, 128 (2d Cir. 2002).

To enable the Government to collect outstanding payments that a defendant owes, section 2044 provides:

> On motion of the United States attorney, the court shall order any money belonging to and deposited by or on behalf of the defendant with the court for the purposes of a criminal appearance bail bond (trial or appeal) to be held and paid over to the United States attorney to be applied to the payment of any assessment, fine, restitution, or penalty imposed upon the defendant. The court shall not release any money deposited for bond purposes after a plea or a verdict of the defendant's guilt has been entered and before sentencing except upon a showing that an assessment, fine, restitution or penalty cannot be imposed for the offense the defendant committed or that the defendant would suffer an undue hardship. This section shall not apply to any third party surety.

28 U.S.C. § 2044. The Second Circuit has approved the application of bail bond funds to satisfy a defendant's outstanding restitution and special assessment obligations. See Brumer, 405 F.

7

App'x at 556. The Government bears the burden of proving by a preponderance of the evidence that the Security "belong[s] to" the defendant. See United States v. Hills, No. 16 Cr. 329 (SL), 2022 WL 1127888, at *3 (N.D. Ohio Apr. 15, 2022) (collecting cases); United States v. Gonzalez, No. 11 Cr. 80211 (KAM) (WM), 2013 WL 654918, at *3–4 (S.D. Fla. Feb. 21, 2013) (same).

As the statute makes clear, Section 2044 does not extend to funds that a third party owned and posted in support of a defendant's bond. See United States v. Ware, Nos. 04 Cr. 1224 (ER) & 05 Cr. 1115 (ER), 2021 WL 3188248, at *1–2 (S.D.N.Y. July 28, 2021) (declining to apply to defendant's outstanding criminal monetary penalties bond amount that defendant's mother had posted and later bequeathed to his siblings); United States v. Equere, 916 F. Supp. 450, 452 (E.D. Pa. 1996) (explaining that § 2044 "applies only to 'money belonging to' the defendant, which has been 'deposited by' the defendant or 'on behalf of the defendant', and does not apply to money owned by a third party"). Despite the mandatory language—"the court shall order . . ."—some courts have interpreted § 2044 as codifying "district courts' long-held discretion to apply a defendant's bail funds toward judgments, rather than a command that such payments be applied." Ware, 2021 WL 3188248, at *1 (collecting cases).

Also relevant to the Motion is Federal Rule of Criminal Procedure 46(g):

> **Exoneration**. The court must exonerate the surety and release any bail when a bond condition has been satisfied or when the court has set aside or remitted the forfeiture. The court must exonerate the surety who deposits cash in the amount of the bond or timely surrenders the defendant into custody.

Fed. R. Crim. P. 46(g). The defendant or other owner of property posted as security for a defendant's bond may move for exoneration under this provision. See Brumer, 405 F. App'x at 555 (denying motion of defendant's wife to exonerate $25,000 she had posted for his bond where those funds derived from marital home that defendant had purchased with proceeds of

8

his criminal activities and was therefore subject to § 2044); United States v. Begleiter, 38 F. App'x 80, 82 (2d Cir. 2002) (summary order) (reversing denial of defendant's motion to exonerate his bail after he fulfilled conditions of his bond). A person other than the defendant asserting ownership must provide documentary evidence demonstrating ownership. See, e.g., Ware, 2021 WL 3188248, at *2 (discussing documentary evidence demonstrating defendant's mother's ownership of portion of bond funds).

B. **Application**

1. **Request for appointment of counsel**

As an initial matter, we consider Mr. Graham's Request, which he did not make until after the Second Hearing, for appointment of counsel. (Dkt. Nos. 116–17). To the extent that Mr. Graham claims a constitutional right to counsel to oppose the Motion, under the Sixth Amendment to the United States Constitution, his right to counsel did not extend beyond his appeal of the Judgment, which was dismissed in 2020. Graham I, 2025 WL 3022327, at *2; see Coleman v. Thompson, 501 U.S. 722, 755–57 (1991) (explaining that "a criminal defendant has no right to counsel beyond his first appeal"); United States v. Reddick, 53 F.3d 462, 464 (2d Cir. 1995) (citing Coleman for the principle that "the constitutional right to counsel extends only through the defendant's first appeal").

To the extent that Mr. Graham invokes the CJA as a basis for requiring the appointment of counsel, the relevant provision of the CJA states:

> A person for whom counsel is appointed shall be represented at every stage of the proceedings from his initial appearance before the United States magistrate judge or the court through appeal, including ancillary matters appropriate to the proceedings.

18 U.S.C. § 3006A(c).  The Second Circuit has explained that "ancillary matters" as used in this provision "refers to those involved 'in defending the principal criminal charge' and not to post-conviction proceedings."  Reddick, 53 F.3d at 464 (quoting Miranda v. United States, 455 F.2d 402, 404–05 (2d Cir. 1972)).  Rejecting an interpretation of § 3006A(c) that would require "the appointed attorney's service to continue indefinitely[,]" the Second Circuit noted that such an interpretation would "place large burdens of questionable value on the bar and the criminal justice treasury."  Id.  The appointment of CJA counsel under § 3006A "rests in the court's sole discretion."  United States v. Fleming, 5 F.4th 189, 194 n.4 (2d Cir. 2021); see 18 U.S.C. § 3006A(a)(2) (permitting CJA appointment "[w]henever the United States magistrate judge or the court determines the interests of justice so require[]").

The Court declines to exercise its statutory discretion to appoint a third CJA counsel to represent Mr. Graham in opposing the Motion.  First, Mr. Graham does not have a statutory right to counsel under § 3006A because the Motion has no bearing on any defense to the principal criminal charges against Mr. Graham—which have been fully adjudicated as set forth in the Judgment—and therefore the Motion is not an "ancillary matter" within the meaning of § 3006A(c).

Second, Mr. Graham was fully and diligently represented by two CJA counsel—Ms. Abate and Mr. Schulman—throughout the briefing on the Motion and at the First Hearing.  While Mr. Graham was pro se at the Second Hearing, neither before nor during the Second Hearing did he request that a new attorney be appointed, and he has repeatedly demonstrated his ability to advance arguments on his own behalf.  (See Dkt. Nos. 85; 110; 118; 121–22).

10

Third, Mr. Graham's maltreatment of his two court-appointed attorneys, Ms. Abate and Mr. Schulman, combined with the timing of the Request, demonstrate that the Request is not in good faith and that appointing a third attorney would not be in the interests of justice.

Accordingly, the Court declines to exercise its discretion to appoint a new attorney to represent Mr. Graham under § 3006A in connection with the Motion.

### 2. The Motion

As set forth in Graham I, "[t]he key issue before the Court is the ownership of the Security." 2025 WL 3022327, at *6. To demonstrate that the Security "belong[s] to" Mr. Graham under § 2044, the Government relies on three pieces of evidence. (Dkt. No. 101 at 4:22–7:21).

First, the Government points to Mr. Graham's agreement, when he executed the Bond, to the Bond Declarations, in which he declared his "ownership" of the Security. (Dkt. No. 8 at 2). The Government notes that Mr. Graham agreed to the Bond Declarations on June 1, 2017 and the Security was posted with the Court on June 8, 2017, before the three financially responsible persons who co-signed the Bond (the "FRPs") agreed to the Bond Declarations when they signed the Bond on June 9 and 10, 2017. (Dkt. No. 101 at 4:25–5: 16; see Dkt. No. 72-4 at 3 (indicating that Amanda and Christian Graham signed on June 9, 2017 and Ms. Bent signed on June 10, 2017)). From this evidence, the Government infers that the Security "belonged to" Mr. Graham under § 2044. (Dkt. No. 101 at 7:17–21). Mr. Graham counters that the fact that the Security was posted before the FRPs signed the Bond does not undermine their assertion of ownership. (Id. at 28:9–21).

Second, the Government points to Mr. Graham's January 2018 plea allocution, during which the Government described, and Judge Abrams approved, without objection from Mr.

Graham or his counsel, an agreement to apply the Security toward Mr. Graham's outstanding restitution. (Dkt. No. 101 at 5:17–6:14; see Dkt. No. 72-7 at 21). Mr. Graham counters that the Government rejected Mr. Graham's counsel's proposal so there was no written agreement to apply the Security to his outstanding restitution, and, even if such an agreement existed, the Government did not take any action in the more than seven years since Mr. Graham's plea. (Dkt. No. 101 at 18:9–24; see Dkt. No. 72-6 at 3).

Third, the Government points to emails from Mr. Graham and Amanda describing the Security as belonging to Mr. Graham. (Dkt. No. 101 at 7:5–16; see Dkt. No. 72-8 at 2 (Mr. Graham requesting "return of my cash bail") (emphasis added); 72-9 at 2 (Amanda requesting "return of cash bail for George Graham") (emphasis added). Mr. Graham responds that there is no presumption that bail funds belong to a defendant. (Dkt. No. 101 at 19:14–16; see Dkt. No. 79 at 4 (citing United States v. Jones, 602 F.2d 687, 688 (5th Cir. 1979))). Mr. Graham also suggests that the Government's seven-year delay in bringing the Motion gives rise to the inference that the Government also believed that the Security did not "belong[] to" Mr. Graham. (Dkt. No. 101 at 13:6–10, 30:6–20).

Notwithstanding these three pieces of evidence, however, the Government has twice acknowledged that it does not have "any information" demonstrating that Mr. Graham "could [have] personally posted" some or all of the Security himself. (Dkt. Nos. 101 at 9:20–25; see Dkt. No. 118 at 4–5). Despite the statements to which the Government points, Mr. Graham has repeatedly and emphatically denied that he posted the Security himself, which the Court finds to be credible. (Dkt. Nos. 79 at 1–3; 85; 101 at 21:15–16, 22:13–14, 23:2; 116; 118:7–10, 8:15–16; 121). In addition, the Court has examined Mr. Graham's plea allocution, in which he admitted

that he used others' personal information to obtain credit cards and make purchases of more than $1,000, fraudulently cashed a check, and used a fake green card.  (Plea Allocution dated Jan. 5, 2018 at 17–18).  None of his admitted conduct gives rise to an inference that, when he signed the Bond, he possessed funds anywhere close to the amount of the Security.

In addition, although no one accepted the Court's invitation to file a motion to exonerate, Mr. Graham's family and friends have asserted that they contributed, at least in part, to the Security. (Dkt. Nos. 69 at 45; 72-5 at 2; 79 at 6, 8).  While these statements remain too ambiguous to warrant releasing the funds to Mr. Graham's family and friends under Rule 46(g), see Graham I, 2025 WL 3022327, at *7, they nevertheless cast further doubt on the Government's contention that Mr. Graham is the owner of the Security.

As Mr. Schulman persuasively argued during the First Hearing, "the Government bears the burden to show that the funds belong to the defendant, and on this record . . . that burden has not been met." (Dkt. No. 101 at 14:15–18).  Both Mr. Schulman and Ms. Abate advanced on Mr. Graham's behalf persuasive arguments why the Motion should be denied.  (Dkt. Nos. 79; 101).  On the current record, the Court finds that the Government has failed to show by a preponderance of the evidence that the Security "belong[s] to" Mr. Graham under § 2044.  Thus, while it is unfortunate that Mr. Graham's obligations to pay restitution to his victims will remain unmet, at this time, the Court declines to order that the Security be applied to the Judgment.

## IV. CONCLUSION

For the reasons set forth above, the Motion (Dkt. No. 65) is DENIED WITHOUT PREJUDICE and Mr. Graham's Request for appointment of counsel (Dkt. Nos. 116–17) is DENIED.

Dated:     New York, New York
           January 7, 2026

SO ORDERED.

_____
**SARAH L. CAVE**
**United States Magistrate Judge**